# UNITED STATES COURT DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GARGOYLE GRANITE & MARBLE, INC.,<br><br>  Plaintiff,<br><br>v.<br><br>OPUSTONE, LLC, dba OPUSTONE STONE TILE CONCEPTS; CH ROBINSON WORLDWIDE, INC.; and UPS GROUND FREIGHT, INC., dba UPS FREIGHT,<br><br>  Defendants. | Ct. No. 2:21-cv-00127-MMB<br><br>**OPINION AND ORDER GRANTING MOTIONS TO DISMISS** |

Two of the three defendants in this case—Opustone, LLC, dba Opustone Stone Tile Concepts, and CH Robinson Worldwide, Inc.—move to dismiss Plaintiff Gargoyle Granite & Marble, Inc.'s complaint. *See* ECF 1 (complaint); ECF 20 (Opustone motion); ECF 21 (Robinson motion).[1] Alternatively, Opustone requests that the court transfer this case to the Southern District of Florida. ECF 20-1, at 2. For the reasons provided below, the court (1) grants Opustone's motion to dismiss and (2) grants Robinson's motion to dismiss but grants Gargoyle leave to file an amended complaint as to Count One within 28 days.

---

[1] The third defendant, UPS Ground Freight, Inc., dba UPS Freight, did not file a motion to dismiss or otherwise answer. The Clerk entered UPS's default on July 15, 2021. ECF 23.

## Factual and Procedural Background

This case arises out of a transaction for the sale and shipment of stone construction materials. Gargoyle is based in Rathdrum, Idaho, and was involved in a construction project in northern Idaho that required the purchase and installation of various stone materials, including "¾ slab Calcutta Gold." ECF 1, ¶¶ 1, 6.

Gargoyle alleges that it contacted Opustone, a Miami-based company, about purchasing the stone, and that Opustone sent Gargoyle a "Sales Order," under which Gargoyle ordered $59,040.43 of stone materials from Opustone for shipment to Idaho. *Id.* ¶¶ 2, 6. The Sales Order is referenced in—but not attached to—the complaint.[2]

The front of the Sales Order itemizes the costs of the products purchased, gives the total pricing, and contains a "paid in full" notation. ECF 20-1, Ex. A, at 1. The back contains two columns of "Additional Terms and Conditions," which include (among many other provisions) various provisions purporting to limit Opustone's liability for loss of, or damage to, the ordered product, and a forum-selection clause providing, *inter alia*, that (1) any litigation arising from the Sales Order must be brought in "a court of competent jurisdiction in Miami-Dade County, Florida," and (2) "[a]ll disputes arising under this Sales Order

---

[2] The Sales Order is attached to Opustone's motion to dismiss. *See* ECF 20-1, Ex. A. Gargoyle does not dispute the exhibit's authenticity.

shall be governed by Florida law including Chapter 672—Uniform Commercial Sales, regardless of conflict of laws statutes." *Id.* at 2 col. 2.

Gargoyle avers that it was not involved in the shipment of the stone other than paying shipping fees. ECF 1, ¶¶ 7–8. Gargoyle contends that Opustone "arranged for" Robinson, a Minneapolis-based entity, to ship the stone and put Robinson in touch with Gargoyle to arrange for payment. *Id.* ¶¶ 3, 8. Once Robinson obtained information from Opustone about the stone's weight and dimensions, Gargoyle wired payment to Robinson for the shipping. *Id.* ¶¶ 9, 11. Gargoyle alleges that it was not offered the option of purchasing additional insurance on the shipment and was not advised, by either Opustone or Robinson, of any limitation of liability for damage to the shipment. *Id.* ¶ 10.

Gargoyle further alleges, upon information and belief, that Opustone packaged the stone material in three boxes for shipment and delivery and that UPS was "the entity that actually transported" the stone material. *Id.* ¶¶ 11, 14. At some unknown time and place, the contents of one of the three boxes of stone—the box containing the Calcutta Gold stone—were "damaged in transit." *Id.* ¶ 12. Robinson notified Gargoyle of the damage and provided photos. Gargoyle alleges that based on these photos alone it rejected the delivery—prior to actual receipt—"as non-conforming as the stone was broken and cracked and entirely unusable." *Id.*

Gargoyle avers that Robinson helped it submit a claim of $60,362.79 to UPS for the damaged stone but that UPS paid only $4,084.87, citing a limitation of liability clause in its contract with Robinson. *Id.* ¶¶ 13–15. Gargoyle asserts that it was not a party to the UPS–Robinson contract, was unaware of any limitation of liability, did not agree to any such limitation, and had no contract of its own with UPS or Robinson. *Id.* ¶ 15. Gargoyle alleges that it unsuccessfully demanded compensation from Robinson and Opustone. *Id.* ¶ 16.

Gargoyle's complaint alleges four counts. *Id.* ¶¶ 17–32. Count One alleges that UPS and Robinson are liable for the actual loss or injury of the product under the Carmack Amendment, 49 U.S.C. § 14706, as motor carriers or freight forwarders. *Id.* ¶ 18. Count Two alleges that Opustone breached its contract with Gargoyle by failing to provide usable product that conformed to the contract. *Id.* ¶¶ 22–23. Count Three asserts a claim against Opustone under the Idaho Uniform Commercial Code, Idaho Code § 28-2-201 *et seq.*, for reimbursement of the cost to replace the non-conforming goods and incidental and consequential damages. *Id.* ¶¶ 25–28. Finally, Count Four alleges negligence against "Defendants." *Id.* ¶¶ 29–32.

Gargoyle's complaint alleges that this court has federal question subject-matter jurisdiction under 28 U.S.C. § 1331 as well as the Carmack Amend-

ment, 49 U.S.C. § 14706(d),[3] and venue under the latter. ECF 1, ¶ 5.[4] In so alleging jurisdiction, the complaint does not distinguish between the asserted federal and state-law claims.

Opustone moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, Rule 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(3) for lack of venue, and Rule 12(b)(6) for failure to state a claim. ECF 20, at 2; *see* Fed. R. Civ. P. 12(b). Alternatively, Opustone moves to "transfer this case to a court of competent jurisdiction in Miami[-]Dade County, Florida, pursuant to 28 U.S.C. § 1404(a)." ECF 20-1, at 23.

For its part, Robinson moves to dismiss under Rule 12(b)(6) for failure to state a claim as to the only counts asserted against it, Counts One (Carmack Amendment) and Four (negligence). ECF 19, at 2.

---

[3] The Carmack Amendment authorizes concurrent federal and state court jurisdiction for claims brought under that statute: "A civil action under this section may be brought in a United States district court or in a State court. . . ." 49 U.S.C. § 14706(d)(3).

[4] Carmack Amendment claims against a "delivering carrier" may be brought in any federal judicial district in a state "through which" such a carrier operates. 49 U.S.C. § 14706(d)(1). Claims under the statute "against the carrier alleged to have caused the loss or damage" may be brought "in the judicial district in which such loss or damage is alleged to have occurred." *Id.* § 14706(d)(2).

## Discussion

## I.   Subject-matter jurisdiction

Opustone challenges subject-matter jurisdiction, arguing (without explanation or elaboration) that Gargoyle "does not cite a basis for subject-matter jurisdiction" and that diversity jurisdiction does not exist because "the amount in controversy does not exceed $75,000." ECF 20-1, at 13 (citing 28 U.S.C. § 1332(a)). Because the complaint invokes federal question subject-matter jurisdiction for Gargoyle's Carmack Amendment claims against UPS and Robinson, the court surmises that Opustone means to argue that Gargoyle fails to allege any basis for subject-matter jurisdiction over the exclusively state law claims against *Opustone*.

Gargoyle responds that under 28 U.S.C. § 1367,[5] supplemental jurisdiction exists over its state law claims against Opustone. ECF 25, at 9–10. This statute codifies the concept of pendent and ancillary jurisdiction, under "which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that derive from a common nucleus of

---

[5] The supplemental jurisdiction statute provides in relevant part that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—6

operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (cleaned up).

Gargoyle correctly argues that its state-law claims against Opustone and its federal claims against UPS and Robinson all arise out of the same transaction. ECF 25, at 10. Because Gargoyle's state and federal claims derive from a common nucleus of operative facts—Gargoyle's purchase of stone materials from Opustone and the ensuing shipment of such materials from Florida to Idaho—supplemental jurisdiction exists over Gargoyle's state-law claims against Opustone.

That Gargoyle's complaint does not specifically allege supplemental jurisdiction is not fatal because § 1367 "effectively codified" the judicially-created doctrines of pendent and ancillary jurisdiction. *See* 5 Wright & Miller, *Federal Practice & Procedure* § 1207 (4th ed. Oct. 2021 update). Prior to § 1367's enactment, jurisdiction over ancillary and pendent claims did not need to be expressly pleaded because the district court already had subject-matter jurisdiction over the main claims to which those claims were attached. *Id*. Section 1367's enactment imposed no new express pleading requirement. *Id*.[6] Gargoyle's motion to dismiss for lack of subject-matter jurisdiction must therefore be denied.

---

[6] That said, "the better practice is to include an express allegation of the applicability of Section 1367 in the complaint." *Id*.

## II.   Personal jurisdiction

Opustone asserts that the court lacks personal jurisdiction over it, a Florida entity. *See* ECF 20-1, at 14–18. Robinson does not challenge personal jurisdiction and has thereby waived this defense. *See* Fed. R. Civ. P. 12(h)(1)(ii). UPS is in default and has likewise waived any such defense.

"Personal jurisdiction over an out-of-state defendant is proper where permitted by a long-arm statute and where the exercise of jurisdiction does not violate federal due process." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020).[7] The Ninth Circuit has held that Idaho's long-arm statute is co-extensive with the jurisdiction allowed under the due process clause of the United States Constitution, so this court's task is to determine whether the exercise of due process over the defendants accords with constitutional due process. *See Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987) (citing *Doggett v. Elecs. Corp. of Am.*, 93 Idaho 26, 30, 454 P.2d 63, 67 (1969), and *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1286 (9th Cir. 1977)).

A court can exercise personal jurisdiction over a defendant that has "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*

---

[7] The personal jurisdiction analysis is the same regardless of whether subject-matter jurisdiction is based on diversity or, as here, federal question jurisdiction. *See Franko Maps Ltd. v. Nielsen*, No. CIVIL 16-00600 LEK-RLP, 2017 WL 4381669, at *5 n.2 (D. Haw. Sept. 29, 2017).

*Co. v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up). Since *International Shoe*, courts have distinguished between "general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)).

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (citing *Int'l Shoe*, 326 U.S. at 317). In contrast, specific jurisdiction turns "on an 'affiliation between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (citing von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv. L. Rev. 1121, 1136 (1966)). Unlike general jurisdiction, specific jurisdiction only applies to "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (cleaned up).

It is the plaintiff's burden to allege facts necessary to establish personal jurisdiction. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002). "As with Rule 12(b)(1) challenges to subject-matter jurisdiction, a Rule 12(b)(2) challenge to personal jurisdiction may attack the legal theory supporting jurisdiction based on the facts as pleaded (a facial attack) or the facts

themselves (a factual attack)." *Eclipse Grp. LLC v. Target Corp.*, No. 15cv1411-JLS-BLM, 2016 WL 8395077, at *7 (S.D. Cal. May 26, 2016) (citing *Data Disc*, 557 F.2d at 1289).

In challenging personal jurisdiction, Opustone's brief limits its discussion to the facts as pleaded, *see* ECF 20-1, at 16–17, without any mention or discussion of the attached declaration from one of Opustone's managing partners, Eric Schigiel, *see* ECF 20-2. The Schigiel declaration proffers the following facts: (1) Opustone is a Florida limited liability corporation with its principal place of business in Miami; (2) Opustone was formed in Florida in 2001 and conducts business in that state; (3) Opustone distributes its products solely from locations in Miami, Fort Lauderdale, and West Palm Beach; (4) Opustone sells directly to customers and does not have any sales agents or employees outside Florida; and (5) neither Opustone nor its employees maintain a physical location in Idaho or anywhere else outside Florida. *Id.* at 2.

Although Opustone neglected to cite the Schigiel declaration, the court infers that it was intended to support its challenge to both general and specific jurisdiction, and the court notes that Gargoyle reads the declaration the same way. *See* ECF 25, at 12 (general jurisdiction), 16 (specific jurisdiction). Therefore, the court construes Opustone's motion as a factual challenge to personal jurisdiction.

"While a plaintiff cannot 'simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true' and 'conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.' " *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 949 (N.D. Cal. 2017) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). In addition, "[i]f the court determines that it will receive only affidavits or affidavits plus discovery materials, these . . . limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss." *Data Disc*, 557 F.2d at 1285 (cleaned up).

### A.    General jurisdiction over Opustone

Opustone challenges this court's general jurisdiction over it, arguing that Gargoyle has not met its burden of establishing "systematic and continuous contacts with the forum state" because it has not established that Opustone was "conducting business **in** Idaho, not merely **with** Idaho." ECF 20-1, at 14–15 (emphasis in original). Gargoyle responds that there is insufficient evidence on the record to determine whether general jurisdiction exists because the record is silent on "how often Opustone does business with persons and entities [in] Idaho and how often it ships products here." ECF 25, at 12. Gargoyle therefore states that it would request leave to conduct

discovery on Opustone's contacts with Idaho (for purposes of assessing general jurisdiction) if the court finds that it lacks *specific* jurisdiction over Opustone. *Id.*

The court agrees that it cannot exercise general jurisdiction over Opustone. General jurisdiction is a high bar, only available when a defendant is "essentially at home in the forum State" because of its "continuous and systematic" affiliations with that state. *Goodyear*, 564 U.S. at 919; *see also Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014) ("[T]he inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State.") (cleaned up).

A corporation is generally at home where it is incorporated and where it has its principal place of business, *Daimler*, 571 U.S. at 137, but general jurisdiction is not limited only to those locations, *id.* at 137–38 (referring to those places as "paradigm all-purpose forums."). While not limited to those two factors, general jurisdiction is only extended beyond them in the most compelling of circumstances and does not include "every State in which a corporation engages in a substantial, continuous, and systematic course of business." *Id.* at 138 (cleaned up).

The evidence on the record falls far short of showing a substantial, continuous, and systematic course of business by Opustone in Idaho, which itself would be insufficient under *Daimler* to establish general jurisdiction. According to the Schigiel declaration, summarized above, Opustone's operations are centered in Florida and the company has no employees, sales agents, or business locations outside Florida. ECF 20-2, ¶¶ 2–6. Gargoyle's complaint admits that Opustone is a Florida LLC and has its principal place of business in Miami, but alleges that Opustone was "shipping products to, and thus doing business in, the state of Idaho." ECF 1, ¶ 2. This bare-bones allegation does not support general jurisdiction.

Gargoyle's opposition argues that while the record shows that Opustone does not have sales agents in Idaho, it does not demonstrate "how often Opustone does business with persons and entities [in] Idaho and how often it ships products here." ECF 25, at 12. These considerations of contacts with a forum state could strengthen a claim of specific jurisdiction, but they do not support an exercise of general jurisdiction. *See, e.g.*, *Goodyear*, 564 U.S. at 927 ("Flow of a manufacturer's products into the forum . . . may bolster an affiliation germane to *specific* jurisdiction. But ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant.") (cleaned up and emphasis in original). Therefore, Gargoyle's request for discovery on those issues

would not support general jurisdiction. There is no indication that Opustone is "at home" anywhere but Florida. Accordingly, Gargoyle has not made a *prima facie* showing of general personal jurisdiction over Opustone.

### B.   Specific jurisdiction over Opustone

Opustone also challenges the court's specific jurisdiction over it. The Ninth Circuit applies a three-prong test to determine specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011) (emphasis removed) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff has the burden of establishing the first two prongs, after which the defendant has the burden of establishing why "the exercise of jurisdiction would not be reasonable." *Id.* at 1228 (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

### 1.   Purposeful availment or direction

The first question in the specific jurisdiction test is whether a case involves purposeful availment, purposeful direction, or some combination of the two. "For claims sounding in contract, we generally apply a 'purposeful

availment' analysis . . . . For claims sounding in tort, we instead apply a 'purposeful direction' test . . . ." *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (citing *Schwarzenegger*, 374 F.3d at 802–03). Here, Gargoyle alleges two claims against Opustone that sound in contract (Counts Two and Three) and one that sounds in tort (Count Four). ECF 1, at 4–5. Therefore, both tests are relevant.

### a.   Purposeful availment

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's action in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. "[W]here the defendant deliberately has engaged in significant activities within a state, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there . . . ." *Burger King*, 471 U.S. at 475–76. Physical presence in the forum state is not required. *Id*. In determining whether a defendant "purposefully established minimum contacts with the forum," courts are not to take a per se approach but rather more holistically look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id*. at 479.

Here, Gargoyle submitted a declaration by Mary Gouin, the company controller. Her declaration states that originally another company working on

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—15

the construction project communicated with Opustone, but that company eventually looped in Gargoyle because it would be installing the stone as part of the construction project. ECF 25-2, ¶¶ 3–4. The declaration then explains that a Gargoyle employee was copied on a chain of e-mail messages between the other company and Opustone and later engaged in direct e-mail discussions with Opustone. *Id.* ¶ 5. The messages, which constitute a single 16-page chain attached to the declaration, reflect that an Opustone "senior design and architectural sales representative" communicated with the two Idaho businesses and consistently used an auto-signature listing Opustone's business locations as Miami, Fort Lauderdale, West Palm Beach, and Jacksonville. *Id.* at 6–21.

Gargoyle's complaint alleges that its communications with Opustone resulted in the execution of a Sales Order which Opustone "sent" Gargoyle, ECF 1, ¶ 6, so it is reasonable to infer that the agreement, like the negotiations, was entered into without either party entering the other's state. Under the Sales Order, Opustone agreed to ship its product to Idaho and subsequently arranged to do so. *Id.* ¶¶ 6–9. Therefore, Gargoyle has made the requisite showing of purposeful availment.

### b.   Purposeful direction

The Ninth Circuit uses the "effects" test from *Calder v. Jones*, 465 U.S. 783 (1984), to determine "purposeful direction." *Schwarzenegger*, 374 F.3d at 803. The court has interpreted the "effects" test to require "that the

defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The intentional act need not be wrongful. *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) (en banc).

Here, Gargoyle alleges that Opustone (1) packed and arranged for shipment of the product at issue, ECF 1, ¶¶ 7, 11, (2) to its customers in Idaho, *id.* ¶ 6, (3) knowing that the effects of any harm (i.e. the alleged negligence) would be felt in Idaho. Therefore, the *Calder* test is met.

With both purposeful availment and purposeful direction satisfied, Gargoyle has established the first prong of the Ninth Circuit's test.

### 2. Arising out of or related to forum related activities

This dispute grows directly out of Opustone's contacts with Idaho as described above, so the second prong of the Ninth Circuit's test is satisfied.

### 3. Fair play and substantial justice/reasonableness

Because Gargoyle has established the first two prongs of the test, the burden shifts to Opustone to "present a compelling case" that the exercise of jurisdiction would be unreasonable. *Schwarzenegger*, 374 F.3d at 802 (citing *Burger King*, 471 U.S. at 476–78). In considering "whether the assertion of

personal jurisdiction would comport with fair play and substantial justice," courts may look to "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (cleaned up). The *Burger King* Court also noted that "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional," like choice-of-law rules and change of venue requests. *Id.* However, the Court also noted that "jurisdictional rules may not be employed in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." *Id.* at 478 (cleaned up).

Opustone argues that exercise of jurisdiction over it would be unreasonable because "Opustone's purposeful interjection into Idaho was minimal, its burden of litigation in the instant forum would be heavy, and Idaho has less of an interest in adjudicating this issue than Florida, [which] has a right to govern the acts of its citizens and businesses formed under its laws." ECF 20-1, at 18. Opustone further contends that because the Sales Order is governed under Florida law, Florida is the most efficient forum to adjudicate issues due to the expertise of Florida judges and attorneys. *Id.*

None of these factors is a compelling reason not to exercise personal jurisdiction. While Opustone's purposeful interjection into Idaho may not be substantial, it is comparable to Gargoyle's interjection into Florida. And although litigating in this forum may be a heavy burden on Opustone, litigating in Florida would impose an equally heavy burden on Gargoyle.

Both Idaho and Florida have an interest in adjudicating this case. This court can apply Florida law, and while the existence of an alternative forum provides an option, Opustone has not presented compelling reasons for exercising that alternative by denying jurisdiction. The court therefore finds the exercise of personal jurisdiction over Opustone to be reasonable, satisfying the third prong of the jurisdictional test.

As Gargoyle has made a *prima facie* showing of facts sufficient to support specific personal jurisdiction over Opustone, the court denies Opustone's motion to dismiss on personal jurisdictional grounds.

## III.   Venue

Opustone moves under Rule 12(b)(3) and 28 U.S.C. § 1406(a)[8] to dismiss for improper venue. In so doing, it presents two theories. First, as to Gargoyle's exclusively state-law claims against it, Opustone contends that venue in this

---

[8] Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

district is impermissible under the general venue statute, 28 U.S.C. § 1391.[9]

*See* ECF 20-1, at 4–10. Second, it contends that the forum-selection clause in

the Sales Order requires that Gargoyle pursue its state-law claims against

Opustone in federal or state court in Miami. *See id.* at 10–12.

### A.    General venue statute

Opustone appears to observe[10] that even if venue is appropriate in this

district as to Gargoyle's Carmack Amendment claims against Robinson and

UPS under that statute's special venue provisions, *see* 49 U.S.C. § 14706(d)(1)–

(2),[11] Gargoyle has asserted no such claims against Opustone. ECF 20-1, at 6.

Therefore, Opustone (apparently) argues, the general venue provision in

§ 1391 governs venue as to Gargoyle's state law contract and tort claims

against Opustone. *Id.* at 7–10. Opustone further (apparently) argues that

venue under § 1391 does not lie in this district as to those claims because the

---

[9] Section 1391 governs venue in "all civil actions brought" in federal district courts "except as otherwise provided by law." 28 U.S.C. § 1391(a). Under Section 1391, a "civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* § 1391(b).

[10] Opustone's reliance on the *pre-2011* version of 28 U.S.C. § 1391 makes its argument difficult to understand. Accordingly, the court articulates the argument that it surmises Opustone meant to make based on the statute as it currently exists.

[11] *See above* note 4.

company does not reside in this district, *see* 28 U.S.C. § 1391(b)(1), and because this district is not one "in which a substantial part of the events or omissions giving rise to the claim occurred," *id.* § 1391(b)(2).

Opustone's challenge to venue under § 1391 fails for two separate and independent reasons. To begin with, neither Opustone nor Robinson contests that venue lies in this district as to Gargoyle's Carmack Amendment claims against Robinson and UPS. As discussed above, those claims and Gargoyle's state-law claims against Opustone arise out of a common nucleus of operative fact—Gargoyle's purchase of stone materials from Opustone and the ensuing shipment of such materials from Florida to Idaho.

Although the Ninth Circuit does not appear to have addressed the issue, district courts in this circuit and learned treatises recognize "pendent venue." Under that doctrine, "[w]hen one or more claims are closely related, in that they arise out of a common nucleus of operative facts, venue proves proper as to all claims so long as venue is established for just one claim." *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 295 (D. Mont. 2019); *see also* 14D Wright & Miller, *Federal Practice and Procedure* § 3808 (4th ed. 2021) ("[C]laims invoking supplemental jurisdiction under Section 1367 qualify for pendent venue. So if a federal claim has an independent basis of venue, courts will exercise pendent venue over appended state-law claims that share a common nucleus of operative fact with the federal claim."). For the same reasons that

supplemental jurisdiction exists over Gargoyle's state law claims, pendent venue also applies to those claims.

Even if pendent venue did not apply here, venue lies in this district under the general venue statute. Section 1391(b)(1) provides that a civil action may be brought in a "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Section 1391 further provides that an "entity" with the capacity to sue and be sued "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c)(2).

As discussed above, the court concludes that it has personal jurisdiction over Opustone, and UPS and Robinson have waived any objection to personal jurisdiction. Because all three defendants are subject to personal jurisdiction in this district with respect to this civil action, all are "residents" of this district for purposes of § 1391(b)(1), and therefore venue lies in this district. *See* 14D Wright & Miller, *supra*, § 3811.1 (under § 1391(c)(2), "personal jurisdiction [is] a proxy for residence" for purposes of § 1391(b)(1)); *Ward v. Certain Underwriters at Lloyd's of London*, No. 18-CV-07551-JCS, 2019 WL 2076991, at *4 (N.D. Cal. May 10, 2019) (where all defendants "fall within the Court's personal jurisdiction," all are " 'residents' of [the] district under § 1391(c)(2), and venue is proper under § 1391(b)(1)"); *AT&T Corp. v. Teliax, Inc.*, No. 16-CV-01914-

WHO, 2016 WL 4241910, at *2 (N.D. Cal. Aug. 11, 2016) (entity that did not contest personal jurisdiction was deemed a resident under § 1391(b)(1) for venue purposes).

### B.    Forum-selection clause

In addition to challenging venue under § 1391, Opustone invokes the Sales Order's forum-selection clause to challenge venue under Rule 12(b)(3) and § 1406(a). ECF 20-1, at 4. It is well-settled law, however, that such a clause may not be enforced through Rule 12(b)(3) and § 1406(a), which "say nothing about a forum-selection clause." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). "Instead, the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens.*" *Id.* at 60.

Accordingly, the court construes Opustone's Rule 12(b)(3) motion to dismiss based on the forum-selection clause as a motion either to transfer to federal court in Miami under 28 U.S.C. § 1404(a)[12]—which represents a "codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer," *Atl.*

---

[12] Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

*Marine*, 571 U.S. at 60—or to dismiss in favor of state court in Miami based on "the residual doctrine of *forum non conveniens*," which "has continuing application in federal courts" when a forum selection clause "call[s] for a nonfederal forum." *Id*. at 60–61.

"When the parties have agreed to a valid forum-selection clause" providing for venue in a different federal court, "a district court should ordinarily transfer the case to the forum specified in that clause." *Id*. at 62.[13] The Court, however, qualified this teaching with an important caveat: "Our analysis presupposes a contractually valid forum-selection clause." *Id*. at 62 n.5.

Here, Gargoyle challenges the validity of the forum-selection clause invoked by Opustone, arguing that it is not enforceable under Idaho Code § 29-110(1),[14] which represents "a strong public policy against forum-selection clauses." ECF 25, at 7 (quoting *T3 Enters., Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 738, 750, 435 P.3d 518, 530 (2019)).

In the Ninth Circuit, a district court should enforce a forum-selection clause unless, inter alia, "enforcement would contravene a strong public policy

---

[13] And district courts "should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Atl. Marine*, 571 U.S. at 61. In such cases, district courts should apply "the traditional remedy of outright dismissal." *Id*. at 60.

[14] This statute provides that "[e]very stipulation or condition in a contract, by which any party thereto is restricted from enforcing his rights under the contract in Idaho tribunals . . . is void as it is against the public policy of Idaho." Idaho Code § 29-110(1).

of the forum in which suit is brought, whether declared by statute or by judicial decision." *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 916 (9th Cir. 2019) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). *Gemini* involved an appeal in which this court dismissed a case in deference to a forum-selection clause specifying a Delaware state court forum. The Ninth Circuit reversed, holding that § 29-110(1) is "a strong public policy of Idaho" under *Bremen*'s "public policy factor." *Id.*

Under *T3 Enterprises* and *Gemini*, the forum-selection clause invoked by Gargoyle is unenforceable because it contravenes Idaho's strong public policy against forum-selection clauses.[15] The court therefore denies Opustone's motion to transfer to Florida federal court, or to dismiss in favor of Florida state court, based on that clause.

\* \* \*

Venue properly lies in this district under both the Carmack Amendment and the general venue statute, and the forum-selection clause invoked by Opustone is unenforceable. The court therefore denies Opustone's motion under Rule 12(b)(3) to dismiss for improper venue.

---

[15] Because the forum-selection clause invoked by Opustone is unenforceable, the court need not determine whether § 1404(a) would permit a transfer to federal court in Miami based on the forum-selection clause when UPS and Robinson were not parties to the Sales Order. *See* 28 U.S.C. § 1404(a) (authorizing a transfer to another district court when, inter alia, "*all* parties have consented" to that venue) (emphasis added).

**IV.    Robinson's Rule 12(b)(6) motion**

Robinson moves to dismiss Counts One and Four of Gargoyle's complaint—the only counts directed at Robinson—under Rule 12(b)(6). Robinson argues that Count One "fails to factually allege the status of [Robinson] as a motor carrier or freight forwarder, as is required to maintain an action under the Carmack Amendment, 49 U.S.C. § 14706." ECF 19, at 2. As to Count Four, Robinson argues that the state and common law causes of action of that count are "preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14501(c)[,] and the Carmack Amendment, 49 U.S.C. § 14706, and must be dismissed." *Id.*

To survive a Rule 12(b)(6) motion, a complaint must satisfy the Rule 8(a) notice pleading standard, under which it need not contain detailed factual allegations, but must contain more than "a formulaic recitation of the elements of a cause of action." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103–04 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests, and dismissal is appropriate only if the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. In other words, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

its face." *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (cleaned up). The court discusses Counts One and Four in turn.

### A.    Count One—Carmack Amendment

Count One of Gargoyle's complaint contains a single substantive paragraph alleging that Robinson and UPS "were motor carriers or freight forwarders pursuant to 49 U.S.C. § 14706 with respect to the shipment of the Product to Plaintiff. Pursuant to the Carmack Amendment, Defendants are liable to Plaintiff for the actual loss or injury to the Product, which occurred during shipping." ECF 1, ¶ 18 ("defined term" omitted).

Robinson argues that this single paragraph is too bare-bones and conclusory to state a claim under Rule 12(b)(6) and further contends that the gist of Gargoyle's theory is that the latter "paid freight charges for a quote that [Robinson] generated based on weight and dimensions provided by Opustone, thus,

[Robinson] was acting as a freight forwarder," but that "Gargoyle fails to allege any factual allegations that [Robinson] assembled or consolidated and accepted responsibility for the Cargo, all of which are required within the definition of freight forwarder provided by 49 U.S.C. § 13102(8)." ECF 19-1, at 7–8. Robinson contends that, at most, it acted as a "property broker" for purposes of the Carmack Amendment, and both parties agree the Amendment does not apply to property brokers. *See id.* at 6–7 (Robinson); ECF 25-1, at 4–5 (Gargoyle).

Gargoyle responds that Robinson ignores the complaint's factual section, which alleges that after "Opustone arranged for [Robinson] to ship the Product," ECF 1, ¶ 8, Robinson and Gargoyle dealt directly with each other and Gargoyle wired Robinson the money to pay for shipping. ECF 25-1, at 5–6 (citing ECF 1, ¶ 11). The complaint further alleges that after part of the shipment was damaged, Robinson contacted Gargoyle, forwarded pictures of the damaged product, and helped file a claim with UPS. ECF 1, ¶¶ 12–14.

Thus, based on the parties' arguments, the question for purposes of Robinson's Rule 12(b)(6) motion is whether Gargoyle's complaint alleges sufficient facts that, if proven at trial, would allow a trier of fact to conclude that Robinson is either a "motor carrier" or "freight forwarder" for purposes of the Carmack Amendment.

The Carmack Amendment defines a "motor carrier" as "a person providing *motor vehicle transportation* for compensation." 49 U.S.C. § 13102(14)

(emphasis added). The complaint fails to allege facts from which, if taken as true, a trier of fact could conclude or reasonably infer that Robinson is a "motor carrier." Gargoyle's opposition brief tacitly concedes this, as it makes no argument that Robinson is a "motor carrier" for Carmack Amendment purposes. Instead, Gargoyle only argues that Robinson is a "freight forwarder." *See* ECF 25-1, at 10 ("Gargoyle's complaint in this case alleges that Defendant CH Robinson is a freight forwarder, subject to strict liability for damage to the product that occurred during shipment.").

> The Carmack Amendment defines a "freight forwarder" as
>
> a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—
>
> (A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
>
> (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and
>
> (C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle [i.e., 49 U.S.C. subtitle IV].

49 U.S.C. § 13102(8).

To show that a company is a "freight forwarder," Gargoyle's complaint therefore needed to allege that Robinson (1) held itself out as a provider of "transportation of property," (2) assembled or consolidated shipments (or provided the same) or provided for break-bulk and distribution operations of

shipments of such property, (3) assumed responsibility for the transportation of such property, and (4) used a carrier at least in part for the transportation. *Cf. Chemsource, Inc. v. Hub Grp., Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997) (identifying three of the four elements).

The complaint alleges that (1) Opustone selected the method of shipping and arranged for shipment to Idaho, ECF 1, ¶ 7; (2) Gargoyle was not involved with shipping other than paying for it upon request, *id.*; (3) Opustone contacted Robinson to arrange for shipment and gave Gargoyle Robinson's contact information for payment, *id.* ¶ 8; (4) Robinson was unable to quote a price until it received the shipment's weight and dimensions from Opustone, *id.* ¶ 9; (5) Gargoyle wired Robinson money for shipping, *id.* ¶ 11; (6) Robinson informed Gargoyle that one of the boxes in the shipment was damaged and forwarded photos, *id.* ¶ 12; and (7) Robinson helped Gargoyle make a claim with UPS for the damages, *id.* ¶ 14.

Nothing in the foregoing, if taken as true, establishes or even allows for the reasonable inference that Robinson "held itself out to the general public" as providing transportation of property. The complaint contains no allegations about how Robinson portrays itself—the complaint merely says "Opustone arranged for [Robinson] to ship the Product." ECF 1, ¶ 8. It does not contain any allegation from which the court could draw the inference that Robinson represented to either Gargoyle or Opustone that it would be the shipper.

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—30

Nor does the complaint allege that Robinson either "assembled and con-solidated" shipments or provided for the same. "[T]he Supreme Court has held that the term 'assembles and consolidates' means the assembly or consolida-tion of less than carload quantities into carload shipments." *Chemsource*, 106 F.3d at 1361 (citing *Chicago, Milwaukee, St. Paul & Pac. R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 467, 484–86 (1949)). Nothing in the complaint al-leges, or reasonably permits the inference, that Robinson engaged in that sort of activity.

Similarly, the complaint fails to allege that Robinson actually assumed responsibility for transporting the shipment from the place of origin to the place of destination—the complaint simply alleges that Robinson arranged for UPS to transport the shipment, but does not allege, or reasonably allow the inference, that Robinson took responsibility for the shipment itself.

Of the four elements of "freight forwarder," Gargoyle's complaint only alleges the last—that Robinson used a carrier, UPS, for the shipment. The fail-ure to allege the other three elements means that Gargoyle's complaint is in-sufficient as a matter of law to state a claim that Robinson is a "freight for-warder" for purposes of the Carmack Amendment.[16]

---

[16] The parties spend considerable energy debating whether Robinson was a broker in this transaction. At this stage, however, the salient question is whether Gargoyle has sufficiently alleged facts which, if taken as true, establish or least permissibly allow

For the reasons stated above, the court therefore dismisses Count One of Gargoyle's complaint without prejudice insofar as it relates to Robinson, and grants Gargoyle 28 days to file an amended complaint to cure Count One's deficiencies. If Gargoyle fails to file an amended complaint within 28 days, this dismissal of Count One as to Robinson shall be deemed to be with prejudice.

## B.    Count Four—Negligence

Robinson contends Count Four is preempted by the Carmack Amendment and the Interstate Commerce Commission Termination Act ("the Act"). ECF 19-1, at 10–13. Gargoyle responds that "the negligence claim . . . is not intended to state a claim against [Robinson], and only references Opustone in the allegations." ECF 25-1, at 2. Gargoyle offers no response on the merits.

As Robinson notes in its reply brief, however, Count Four's allegations are not, on their face, restricted to Opustone. First, the headings above Counts Two and Three—both of which are limited to Opustone—specifically include "Defendant Opustone" in the count descriptions. *See* ECF 1, at 4 ("COUNT TWO (Breach of Contract—Defendant Opustone)") and 5 ("COUNT THREE (Idaho Code § 28-2-201 *et seq.*—U.C.C.—Defendant Opustone)"). The headings

---

the inference that Robinson is either a motor carrier or freight forwarder, notwithstanding that Robinson may be a broker for some purposes. Because Gargoyle has not sufficiently alleged such facts, the court need not wade into the issue of whether Robinson was a broker in this transaction—even if that could be established at this Rule 12(b)(6) stage, which the court doubts.

for Counts One and Four contain no such limitations. *See id.* at 4 ("COUNT ONE (Carmack Amendment, 49 U.S.C. § 14706)") and 5 ("COUNT FOUR (Negligence)").

Second, the allegations in Count Four are not limited to Opustone. The substantive allegation reads, "*Defendants* had a duty of reasonable care during the packing and shipment of the Product, which, upon information and belief, was breached, causing the Product to be broken and unusable," *id.* ¶ 31 (emphasis added), and the count then concludes, "As a result of *the Defendants'* negligence, Plaintiff has been damaged in the amount of $60,362.37," *id.* ¶ 32 (emphasis added). Robinson reasonably interprets the use of "Defendants" in the plural and the plural possessive as referring to multiple defendants.

Gargoyle does not dispute that the Carmack Amendment preempts the negligence claim in Count Four insofar as it is directed at Robinson and insofar as the latter is a carrier or freight forwarder as Gargoyle alleges. Nor could it. *See Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 613 (9th Cir. 1992); *see also Tokio Marine & Fire Ins. Grp. v. J.J. Phoenix Express, Ltd.*, 156 F. Supp. 2d 889, 895 (N.D. Ill. 2001) ("[T]he Carmack Amendment preempts a shipper's state law claims against carriers and freight forwarders for goods lost or damaged in interstate transit.").

Nor does Gargoyle dispute that if Robinson is a broker as the latter contends, the Act preempts Count Four's negligence claim insofar as it is directed

against Robinson. *See* 49 U.S.C. § 14501(c) (preempting state law "related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property"); *ASARCO LLC v. England Logistics Inc.*, 71 F. Supp. 3d 990, 1006–07 (D. Ariz. 2014) (holding that the Act preempted a negligence claim against a broker); *Ameriswiss Tech., LLC v. Midway Line of Ill., Inc.*, 888 F. Supp. 2d 197, 205–06 (D.N.H. 2012) (same).

Because the negligence allegations of Count Four facially apply to Robinson, and because Gargoyle does not dispute that such claims are preempted whether Robinson is characterized as a freight forwarder or broker, the court dismisses Count Four with prejudice.

## V.  Opustone's Rule 12(b)(6) motion

Opustone moves under Rule 12(b)(6) to dismiss all three claims against it based on various contractual limitations of liability. The Sales Order between Gargoyle and Opustone is referred to multiple times in the complaint, *see* ECF 1, ¶¶ 6, 21–24, 26–28, but is not attached as an exhibit. Instead, Opustone attached a document to its motion to dismiss as Exhibit A and asserts that it contains the contract between the two parties. ECF 20-1, at 2 ("The form of agreement between Plaintiff and Opustone was a Sales Order with attached Terms and Conditions (the 'Contract' attached hereto as Exhibit 'A') . . . .").

In evaluating a Rule 12(b)(6) motion, the court's review is ordinarily limited to the contents of the complaint and material properly submitted therewith. However, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on" the motion. *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994) (citing, with approval, 5 Wright & Miller, *Federal Practice & Procedure* § 1327 (2d ed. 1990) ("[W]hen [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading.")), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Gargoyle does not dispute that the Sales Order attached to Opustone's motion constitutes the parties' contract, so the court may consider it in deciding the motion.

Gargoyle argues (without any citation to authority) that it is inappropriate for the court to dismiss based on a contractual limitation of liability because that sort of issue is not properly raised via a Rule 12(b)(6) motion. ECF 25, at 20–21. While ordinarily affirmative defenses may not be raised via a motion to dismiss, that principle does not apply where a defense raises no disputed issues of fact, *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984), or where, for example, the allegations in the complaint are contradicted by matters

subject to judicial notice or by documentary evidence to which the complaint refers, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Opustone urges this court to dismiss Counts Two, Three, and Four based on a provision in the Sales Order's Warranty and Disclaimer paragraph providing that "Opustone is not responsible for any risk of loss of Products at any time from purchase to delivery." ECF 20-1, Ex. A, at 2 col. 1 (Sales Order); *see* ECF 20-1, at 20 (arguing that "Opustone cannot be held responsible for the damage and Plaintiff has failed to state a claim against Opustone upon which relief can be granted"). The court must therefore determine whether this provision—which the court will call the "Risk of Loss clause"—bars Gargoyle's claims.

The contract here provides that "[a]ll disputes arising under this Sales Order shall be governed by Florida law including Chapter 672—Uniform Commercial Sales, regardless of conflict of laws statutes." ECF 20-1, Ex. A, at 2 col. 2. The Idaho Uniform Commercial Code recognizes parties' power to choose the law governing their transaction and will uphold their selection if the transaction "bears a reasonable relation" to the chosen jurisdiction. *Cerami-Kote, Inc. v. Energywave Corp.*, 116 Idaho 56, 58, 773 P.2d 1143, 1145 (1989) (discussing Idaho Code § 28-1-105(1)[17]). The *Energywave* court found that where a

---

[17] Now codified at Idaho Code § 28-1-301.

party was a Florida corporation with its principal place of business in that state and was to perform its contractual obligations at least partially in Florida, a choice-of-law clause specifying Florida law was enforceable. *Id.*

The same principles apply here—it is undisputed that Opustone is a Florida LLC with its principal place of business in Miami, and it appears undisputed that Opustone would perform its obligations in Florida. Thus, Florida law governs interpretation of the parties' contract, at least as to Gargoyle's contract claim in Count Two and statutory UCC claim in Count Three.

The Florida Supreme Court has held that while exculpatory clauses are disfavored, public policy favors enforcement of contracts, and "unambiguous exculpatory contracts are enforceable unless they contravene public policy. Exculpatory clauses are unambiguous and enforceable where the intention to be relieved from liability was made clear and unequivocal and the wording was so clear and understandable that an ordinary and knowledgeable person will know what he or she is contracting away." *Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 260–61 (Fla. 2015) (cleaned up).

Under these principles of Florida law, the Risk of Loss clause bars Gargoyle's breach of contract and statutory UCC claims (Counts Two and Three) against Opustone because it clearly and understandably provides that "Opustone is not responsible for any risk of loss of Products at any time from purchase to delivery nor has Opustone provided you with any guaranteed

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—37

delivery date." ECF 20-1, Ex. A, at 2 col. 1. Gargoyle's breach of contract and UCC claims both relate to damage to the purchased stone at some point during the delivery process, as both counts incorporate the allegations in every preceding paragraph by reference. *Id.* ¶¶ 20 ("Plaintiff restates the allegations contained in paragraphs 1–19 as if fully set forth herein."), 25 (same but referring to ¶¶ 1–24). Paragraph 12, in turn, alleges that Robinson informed Gargoyle that "the box containing the Calcutta Gold Stone[ ] had been damaged in transit," *id.* ¶ 12, Paragraph 14 alleges that Gargoyle submitted a claim to UPS "for the Product damaged during shipment," *id.* ¶ 14, and Paragraph 18 (which is part of Count One but is included in Counts Two and Three's incorporation clauses) alleges that the "actual loss or injury to the Product . . . occurred during shipping," *id.* ¶ 18. Therefore, the Risk of Loss clause bars Counts Two and Three as a matter of law.

Gargoyle's negligence claim in Count IV, however, requires a somewhat different analysis, because "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather, they are decided according to the [choice of law rules] of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (cleaned up); *cf. Pro-Formance Lube Ctr., Inc. v. BP Lubricants USA, Inc.*, No. CIV 08-00290-BLW, 2009 WL 10678745, at *3 (D. Idaho July 31, 2009) (applying Idaho choice of law rules to tort claims notwithstanding contractual choice-of-law provisions).

Idaho applies the "most significant relationship test" to determine the choice of law for tort claims. *First Bank of Lincoln v. Land Title of Nez Perce Cnty., Inc.*, 165 Idaho 813, 821, 452 P.3d 835, 843 (2019). Under that test, a court considers "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation[,] and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id*. Of these, "the most important" is "the place where the injury occurred." *Id*. These contacts "are evaluated under the policy concerns outlined in" § 6 of the Restatement (Second) of Conflict of Laws. *Id*. at 821–22, 452 P.3d at 843–44.[18]

Here, the injury occurred in Idaho, where Gargoyle did not receive the undamaged stone it contracted to buy. The alleged conduct that is the source of the injury, Opustone's negligence in packing the stone for shipment, occurred in Florida. Gargoyle of course is based in Idaho while Opustone's home is Florida. There is no place where the relationship between the two is

---

[18] Those concerns are

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

centered—it is equally divided between Idaho and Florida. The contacts are thus in rough equipoise, and under Idaho law the tie-breaking consideration is the location of the harm, Idaho.

Under the considerations outlined in § 6 of the Restatement (Second) of Conflict of Laws, the court sees nothing that would tip the balance back in favor of applying Florida law. Both Idaho and Florida have an interest in resolution of Gargoyle's negligence claim against Opustone, and the court can easily determine and apply the law of either jurisdiction. Idaho, however, has a strong policy in favor of applying Idaho law in tort cases involving harm suffered in Idaho. For essentially the same reasons that it is reasonable to subject Opustone, an interstate seller, to the personal jurisdiction of an Idaho court, the court finds that it is reasonable and consistent with the needs of the interstate system to apply Idaho's policy of applying its law when the harm is suffered there.

Under Idaho law, "courts look with disfavor" on exculpatory provisions "and construe such provisions strictly against the person relying on them, especially when that person is the preparer of the document." *Jesse v. Lindsley*, 149 Idaho 70, 75, 233 P.3d 1, 6 (2008). "Clauses which exclude liability must speak clearly and directly to the particular conduct of the defendant which caused the harm at issue." *Id.* Nevertheless, exculpatory clauses that clearly and directly excuse a party's negligence are enforceable in Idaho, subject to two

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—40

exceptions: "(1) one party is at an obvious disadvantage in bargaining power; or (2) a public duty is involved (public utility companies, common carriers)." *Id*.

Under these principles of Idaho law, the Risk of Loss clause[19] does not clearly and directly speak to Gargoyle's negligence claim in Count Four. Under the Risk of Loss clause, it is not obvious that Gargoyle assumed the risk of loss resulting from Opustone's own negligence.[20]

Nevertheless, that is not the end of the matter as far as Count Four is concerned. The Sales Order contains a further limitation of liability provision, which the court will call a "Delivery Exclusion," in the "Storage and Delivery" paragraph: "Furthermore, Customer agrees that *any and all claims related to* delayed delivery and/or *damage during delivery shall be brought solely against shipper*, whether shipper was selected by Customer or Opustone." ECF 20-1, Ex. A, at 2 col. 1 (emphasis added). In barring "any and all claims related to . . . damage during delivery," the Delivery Exclusion is considerably broader than the Risk of Loss clause.

---

[19] "Opustone is not responsible for any risk of loss of Products at any time from purchase to delivery . . . ." ECF 20-1, Ex. A, at 2 col. 1.

[20] The court notes that the result would be the same if Florida law governed Gargoyle's tort claim in Count Four. *See Sanislo,* 157 So. 3d at 261 (an exculpatory clause's terms must "clearly and unequivocally" release a party of liability for its own negligence or negligent acts when the clause does not contain express language regarding negligence or negligent acts).

In barring "any and all claims related to . . . damage during delivery," the Delivery Exclusion encompasses damage during shipment, as "delivery" necessarily includes shipment. *See The American Heritage Dictionary of the English Language*, at 349 (1981) (defining "delivery" as including "[t]he act of transferring to another" and "the act of delivering and conveying"). Consistent with that reading of "delivery," the Delivery Exclusion requires that all claims for loss arising from the delivery be brought against "the shipper."

As written, the Delivery Exclusion bars Count Four because that count alleges that "[t]he Product was damaged and broken during shipment," ECF 1, ¶ 30, and that the damage during shipment was caused by Opustone's failure to exercise "reasonable care during the packing and shipment of the Product," *id.* ¶ 31. Even accepting Count Four's allegation of negligence as true, that claim is "related to . . . damage during delivery" because Count Four alleges that Opustone's negligent packing caused the damage. *Cf. Lee v. Sun Valley Co.*, 107 Idaho 976, 978, 695 P.2d 361, 363 (1984) (exculpatory clause that applied to "*every and all claim* [sic] which may arise from injury, which might occur *from use of said horse and/or equipment*" barred negligence claim) (emphasis added).

This reading of the Delivery Exclusion is reinforced by the Sales Order's related provision that "Customer [i.e., Gargoyle], at all times, *agrees to fully insure, guard, protect[,] and maintain, at Customer's sole expense, all Products.*

OPINION AND ORDER GRANTING MOTIONS TO DISMISS—42

All Products are stored and shipped without insurance unless Customer requests such insurance in writing and pays for same in full, all prior to storage and/or delivery of the Products." ECF 20-1, Ex. A, at 2 col. 1 (emphasis added). The Sales Order thus required Gargoyle to insure, at its expense, against the type of loss barred by the Delivery Exclusion.

Finally, neither exception to enforcement of an exculpatory clause recognized by Idaho applies because Gargoyle does not suggest, nor could it, that it faced "an obvious disadvantage in bargaining power" as compared to Opustone, or that "a public duty" on the part of Opustone is implicated here. *Lee,* 107 Idaho at 978, 695 P.2d at 363. Thus, the Delivery Exclusion bars Gargoyle's negligence claim in Count Four, which must be dismissed with prejudice.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** as follows:

1.    Opustone's Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction is **DENIED**.

2.    Opustone's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is **DENIED**.

3.    Opustone's Rule 12(b)(3) motion to dismiss for improper venue is **DENIED**.

4.    Robinson's Rule 12(b)(6) motion to dismiss Counts One and Four is **GRANTED**. Count One is **DISMISSED WITHOUT PREJUDICE** insofar

as its allegations relate to Robinson, but Gargoyle is granted 28 days' leave to amend and replead its complaint as it relates to Count One's Carmack Amendment claim against Robinson. If Gargoyle fails to amend its complaint within 28 days, Count One shall be deemed dismissed with prejudice insofar as it relates to Robinson. Count Four is **DISMISSED WITH PREJUDICE** insofar as its allegations relate to Robinson.

     5.    Opustone's Rule 12(b)(6) motion to dismiss is **GRANTED**. Counts Two, Three, and Four (insofar as Count Four relates to Opustone) of Gargoyle's complaint are **DISMISSED WITH PREJUDICE**.

     6.    Opustone's motion under 28 U.S.C. § 1404(a) to transfer to the Southern District of Florida is **DENIED AS MOOT**.

Dated: November 22, 2021

/s/ *M. Miller Baker*
M. Miller Baker, Judge[21]

---

[21] Judge of the United States Court of International Trade, sitting by designation.